**Carol NORTH, Appellant,**

v.

**STATE of Iowa, Appellee.**

No. 85–1831.

Supreme Court of Iowa.

Feb. 18, 1987.

William L. Meardon and Thomas D. Hobart of Meardon, Sueppel, Downer & Hayes, Iowa City, for appellant.

Charles T. Traw of Leff, Leff, Leff, Haupert & Traw, Iowa City, for appellee.

Considered by REYNOLDSON, C.J., HARRIS, McGIVERIN, WOLLE, and LAVORATO, JJ.

WOLLE, Justice.

Plaintiff Carol North brought this action alleging that officials of the University of Iowa College of Medicine wrongfully refused to readmit her to the school following an authorized one-year leave of absence. She alleged that the State's arbitrary and unreasonable actions amounted to conduct that was actionable as a breach of contract, tort, and civil rights violation. She claimed that the State thereby damaged her by causing a delay in her medical education, additional school expense, mental anguish, and loss of employment opportunities and income. Following a bench trial the trial court entered judgment for the State, finding that the continued enrollment decision she challenged was one reserved for faculty discretion. The court found no enforceable contract, no interference with business expectancy and no violation of civil rights. North assigns as error the trial court's failure to enter judgment in her favor on one or more of the asserted causes of action. We find no merit in her arguments and affirm.

I. *Background Facts.*

When North was an undergraduate student at the University of Iowa she submitted a written application for admission to the University of Iowa College of Medicine. In the application she disclosed that she had experienced "adolescent adjustment reaction." Her application was accepted, she was enrolled unconditionally in the medical school for the semester beginning in August of 1976, and she successfully completed her first semester of course work.

Unfortunately in the spring of 1977 during her second semester at the medical school North began to experience schizophrenic symptoms similar to those she had encountered as an undergraduate. The symptoms—delusions and catatonic tendencies—caused her increasing difficulty with her schoolwork and required periodic hospitalizations. With psychiatric help North satisfactorily completed that second semester of medical school. During the fall semester of 1977, however, North again fell behind in her schoolwork and this time received permission to finish one course at a later date. Permission was granted by the medical school's student promotions committee which had the responsibility of evaluating student performance, subject to review by faculty members serving on the school's medical council and executive committee (medical/executive committee). By early January of 1978 North still had symptoms of schizophrenia and requested a one-year leave of absence. The associate dean of the college responded with a written letter of approval dated January 5, 1978 that in pertinent part stated:

I have received your letter requesting a one year leave of absence from the medical curriculum. With the understanding that you will have a psychiatric evaluation prior to your return to classes, the leave of absence is granted. Please inform me of your continued intention to return to the medical curriculum in January 1979 by October 1978.

During that leave of absence, North continued psychiatric treatment and worked at the university doing research. In September of 1978 she requested readmission to the medical school for the semester beginning in January of 1979 and furnished the school her psychiatrist's recommendation that she be readmitted in January. North started hemodialysis in November, becoming the university's first patient to receive this experimental treatment for schizophrenia. North's response to hemodialysis was extraordinary; her symptoms virtually disappeared.

In December of 1978 the promotions committee met, reviewed several psychiat-

ric evaluations of North, and voted to send no recommendation to the medical/executive committee. Instead, the promotions committee directed the school's associate dean to prepare a statement of conditions which North would be required to meet in the event of her readmission. The dean drafted ten conditions for readmission, and North and her psychiatrist indicated the conditions were fair and acceptable. The conditions included continued psychiatric care, periodic independent psychiatric evaluation, and a contingency plan in the event the symptoms recurred. Nevertheless, the experimental nature of hemodialysis in the treatment of schizophrenia and the brief duration of North's apparent remission prompted the medical/executive committee to conclude that the interests of both North and the medical school would best be served by postponing the readmission decision for another year. North's administrative appeal of that decision was denied. She continued her research work at the university, but in May of 1979 she also filed an action against the State requesting readmission to the school by way of declaratory and injunctive relief. That lawsuit had not reached trial when North in January of 1980 again applied for readmission to medical school. The medical/executive committee again determined that North should be allowed to continue her studies not unconditionally but subject to conditions like those imposed by the dean and promotions committee the year before. North refused to accept a conditional readmission and subsequently received the degree of medical doctor from Washington University in St. Louis. At the time of trial, she was in her third year of psychiatry residency there.

In March of 1980, North amended her injunction action to request relief from the denial of unconditional readmission to the medical school in January of 1980. Six months later she filed the law action now before us seeking damages from the State on theories of breach of contract, interference with business expectancies, and violation of her civil rights. The law and equity actions were consolidated for trial, but North's graduation from another medical school then mooted the injunction action. Only the damage action is before us for review.

## II. *Breach of Contract Theory.*

North first urges upon us her contract theory of letter offer and acceptance. She argues that the January 5, 1978 letter from the associate dean of the college granting her a leave of absence was accepted by her, forming the basis of an express contract. She contends the school breached that contract when it failed to readmit her once she had satisfied the only conditions to readmission expressed in the letter—reapplication by October of 1978 and submission of a report of psychiatric evaluation.

■ We have jurisdiction to decide that contract claim because it falls outside the State Tort Claims Act, Iowa Code chapter 25A. We abrogated governmental immunity in breach of express contract actions in *Kersten Co. v. Department of Social Services,* 207 N.W.2d 117, 122 (Iowa 1973) ("[T]he State, by entering into a contract, waives its defense of governmental immunity and consents to be sued for breach thereof."); *accord Jones v. Iowa State Board of Regents,* 385 N.W.2d 240, 241 (Iowa 1986).

■ In reaching the merits of North's contract theory, however, we must be mindful of our limited scope of review. The trial court's findings of fact have the effect on appeal of a special verdict, when they are supported by substantial evidence. *See Whiteaker v. State,* 382 N.W.2d 112, 114 (Iowa 1986). North had the burden of proving all elements of her contract action, including the existence of an enforceable express contract, but the trial court found she had not proved such a contract. North can prevail in this appeal only if she carried her burden as a matter of law. *Liberty Mutual Insurance Co. v. Winter,* 385 N.W.2d 529, 532 (Iowa 1986); *Whiteaker,* 382 N.W.2d at 114. North's evidence is not that strong.

A prerequisite to formation of the contract North postulates is the parties' mutual manifestation of assent to the same terms. *Woodburn v. Northwestern Bell Telephone Co.*, 275 N.W.2d 403, 406 (Iowa 1979); *Service Employees International, Local No. 55 v. Cedar Rapids Community School District*, 222 N.W.2d 403, 408 (Iowa 1974). The trial court, however, observed that the terms North now ascribes to the associate dean's letter were not those she understood upon its receipt. The trial court wrote:

> Dr. North asked for a one year leave of absence because of her health problems. Dr. North recognized that her continuing in the College of Medicine (whether or not the leave of absence was granted) was conditioned on the faculty allowing her to continue in the College of Medicine. She knew that the Student Promotions Committee would pass on her promotion to the second semester of her second year. She also knew that the Medical Council and Executive Committee would review her progress and determine if she would be able to continue. [The associate dean's] letter did nothing more than notify Dr. North that she would be able to continue in the College of Medicine if allowed by the faculty committees. She was aware that the procedures which were used were the same for her as all other students enrolled in the College of Medicine. To claim that [the associate dean's] letter is an enforceable promise which grants her unconditional acceptance in the College of Medicine after a one year period of time is simply untenable.

In sum, the trial court found no factual basis for North's claim that the associate dean's letter and surrounding circumstances constituted an express contract enforceable against the State. The evidence is not so one-sided in North's favor as to mandate a contrary finding as a matter of law.

Because the evidence fully supports the trial court's finding that North and the State had no express contract for her readmission to the medical school, we affirm the judgment entered for the State on North's contract theory.

### III.   *Tortious Interference Theory.*

North labeled her second theory of recovery "tortious interference with business opportunity", alleging that the State's unreasonable actions deprived her of a business expectancy with a reasonable probability of future economic benefit. North contends, as she must to be successful in this appeal, that she has proved as a matter of law all the elements of that tort. We have recognized the tort of interference with prospective business advantage, explaining that Iowa law thereby protects expectancies of future contractual relations such as the "opportunity of obtaining customers." *Page County Appliance Center v. Honeywell*, 347 N.W.2d 171, 177 (Iowa 1984) (quoting W. Prosser, *Law of Torts* § 130, at 950 (4th ed. 1971)); *Stoller Fisheries, Inc. v. American Title Insurance Co.*, 258 N.W.2d 336, 340 (Iowa 1977).

The trial court found that North had not sustained her burden to prove that she had lost any existing business expectancy. The court wrote that "[j]ust because she had been accepted as a student at the college of medicine, she was not guaranteed a license to practice medicine."

Although the State's fallback position is that the trial court was correct in finding against North on the merits of her tortious interference action, the State's primary contention is that Iowa courts lack jurisdiction to reach the merits because the State is immune from suit on that theory. The State's primary position is correct; we have no jurisdiction to reach the merits.

Iowa Code section 25A.14(4) provides:

> The provisions of this chapter shall not apply with respect to any claim against the state, to:
>
>    . . . .
>
> 4. Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or *interference with contract rights*.

(Emphasis added.) Because the "issue whether the legislature intended to waive its sovereign immunity with respect to a particular type of claim is a matter of jurisdiction," *Hyde v. Buckalew*, 393 N.W.2d 800, 802 (Iowa 1986), the State may raise the issue at any time, even initially on appeal.

We have not before determined whether tortious interference with business advantage constitutes "interference with contract rights" under Iowa Code chapter 25A. We therefore look for guidance to cases examining 28 United States Code section 2680(h) (1981), an identical Federal Tort Claims Act provision. *See Hyde*, 393 N.W.2d at 802. Federal courts addressing the issue have held that claims alleging interference with prospective pecuniary advantage are included within the term "interference with contract rights" and thus fall outside the reach of the Federal Tort Claims Act. *See Art Metal—U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 n. 5 (D.C.Cir.1985); *Bell v. United States*, 635 F.Supp. 638, 642 (E.D.Va.1986); *Bosco v. U.S. Army Corps of Engineers*, 611 F.Supp. 449, 454 (N.D.Tex.1985). The *Art Metal* court persuasively pointed out that there is at most an artificial distinction, the security of an existing contract, that separates the duty not to interfere with a person's economic relationship with third parties and the duty underlying a claim for interference with contract rights. 753 F.2d at 1154–55. We agree with that reasoning.

The Iowa Tort Claims Act exempts the State from an action for "interference with contract rights" (Iowa Code § 25A.14(4)) and thereby also exempts the State from an action for tortious interference with business advantage. The trial court, and our court, lack subject matter jurisdiction to hear and decide the merits of North's tortious interference theory. Although the trial court therefore should have dismissed that action for lack of jurisdiction rather than reaching the merits, the result is the same. We affirm the district court's entry of judgment for the State on North's tortious interference claim.

## IV. *North's Civil Rights Theory.*

North's final theory for recovery of damages was that the State had violated her civil rights. North initially asserted only a common law civil rights action but mended her hold before submission of the case to the trial court by arguing that the school's action violated 42 United States Code section 1983. North asserted that the State acted arbitrarily and unreasonably in refusing to reinstate her after she met the associate dean's conditions, and this constituted a deprivation of property violating her substantive and procedural due process rights under the fifth and fourteenth amendments to the United States Constitution.

It is not altogether clear that North raised in the district court the due process issues she now argues on appeal; we nevertheless pass the question of issue preservation and address the trial court's decision which reached the merits and found against North on her civil rights claim.

The sound reasoning of the trial court rejecting the section 1983 theory bears repeating. Addressing the claim based on procedural due process, the trial court wrote:

> During her attempt to seek readmission to the college of medicine, she was given a chance to meet with the several committees who would make the determination that she should continue, and she was able to have representatives appear on her behalf. She was always given notice and an opportunity to be heard. The faculty committees which ultimately made the decisions on every student's ability to proceed with his or her medical education made a fair, reasonable, and meaningful determination of Dr. North's ability to continue with her medical education, based on all the information before them. She was not denied procedural due process of law.

With regard to North's claim that substantive due process was violated by State ac-

tions which were unreasonable and arbitrary, the trial court found:

> The faculty of the college of medicine determined that they had to balance [North's] ability to satisfactorily complete her courses at the University of Iowa College of Medicine with the potential danger to patients whom she would be seeing in the course of her education beginning in the second year.... The faculty at the University of Iowa College of Medicine readmitted Dr. North when it believed she was able to complete her studies and under conditions by which no patients would be in any danger. The college of medicine's action was not unreasonable nor arbitrary; in fact, it protected all concerned interests.

The record fully supports those findings. We conclude, as did the trial court, that North completely failed to sustain her burden of proving that the college officials acted in a manner which deprived her of due process, substantive or procedural.

The trial court appropriately emphasized that it was extremely reluctant to involve itself in the discretionary function of officials of academic institutions who must daily decide who should be admitted, who should be readmitted, who should be graduated, and how the performance of students should be measured. The United States Supreme Court has recently reemphasized the large measure of discretion to which academic decisions are entitled. In *Regents of University of Michigan v. Ewing*, 474 U.S. ——, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the court refused to overturn an enrollment decision concerning a medical student, explaining:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment....

> Considerations of profound importance counsel restrained judicial review of the substance of academic decisions.

474 U.S. at ——, 106 S.Ct. at 513, 88 L.Ed.2d at 532–33. State courts are no more suited than federal courts "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking.'" *Id.* (quoting *Board of Curators University of Missouri v. Horowitz*, 435 U.S. 78, 89–90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124, 135 (1978)).

We affirm the findings of fact, conclusions of law, and judgment entered by the trial court in favor of the State, there being no merit in any of North's assignments of error.

AFFIRMED.